UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-60528-CIV-COHN/SELTZER

TRANSATLANTIC LINES LLC,

    Plaintiff,

v.

PORTUS STEVEDORING LLC,

    Defendant,

v.

MOBRO MARINE, INC.,

    Third-Party Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** came before the Court for nonjury trial on August 26 through August 31, 2015. The parties provided the Court with revised proposed findings of fact and conclusions of law on September 11, 2015 [DE 115–17], and Third-Party Defendant Mobro Marine, Inc., filed a notice of supplemental authority on October 2, 2015 [DE 118]. The Court has considered all submissions, the evidence presented at trial and is otherwise advised in the premises.

Plaintiff Transatlantic Lines, LLC has sued Portus Stevedoring, LLC for improperly loading the vessel *Atlantic Trader*. Plaintiff alleges that because of Portus's misfeasance, the *Atlantic Trader*'s cargo-securing system failed while the vessel was underway, and twenty-one shipping containers fell overboard. Portus has also brought

Mobro Marine, Inc., into the suit under Federal Rule of Civil Procedure 14(c)(2), alleging that Mobro is directly liable to Transatlantic Lines for at least a portion of the loss.

There is no dispute that on March 4, 2013, while the *Atlantic Trader* was off the coast of Key Biscayne, Florida, its lashings failed and its cargo containers fell overboard.  The Court is called upon to determine why it happened, who is at fault, and to what extent.  For the reasons set forth below, the Court finds that Transatlantic Lines suffered $517,942.03 in damages as a result of the incident.  Portus and Transatlantic each bear fault for the accident.  Mobro does not.  The Court apportions fault for the loss as follows: Transatlantic Lines 60%, Portus 40%.

Pursuant to Federal Rule of Civil Procedure 52, the Court issues the following Findings of Fact and Conclusions of Law.

## I. **FINDINGS OF FACT**

### A. **The Incident and Relationship Among the Parties**

1. On March 4, 2013, lashings aboard the *Atlantic Trader* failed, and 21 shipping containers fell off the vessel.  At the time, the *Atlantic Trader* was off the coast of Key Biscayne, Florida, and on its way to Guantanamo Bay, Cuba, from Jacksonville, Florida.  The lashings failed because wooden 4x4s placed under the shipping containers compressed during the voyage.  This created slack in the lashings and subjected the lines to extraordinary force while the vessel was underway.

2. At the time of the incident, the *Atlantic Trader* was chartered and operated by Transatlantic Lines, LLC.  The *Atlantic Trader* was a barge, and was towed by a tug named the *Spence*, also operated by Transatlantic Lines.

3. Transatlantic Lines had hired Portus Stevedoring, LLC, to load the *Atlantic Trader*.

4.      Before loading, Transatlantic Lines also hired Mobro Marine, Inc., to weld a crane onto the *Atlantic Trader*'s deck.  Additionally, Mobro welded new D-rings onto the *Atlantic Trader*'s deck.  These D-rings connected the lashings to the deck.

**B. Hiring and Loading the *Atlantic Trader***

5.      Transatlantic Lines regularly transported cargo from Jacksonville to Guantanamo Bay, on barges that departed every other Thursday.  But it did not regularly use the *Atlantic Trader* for this purpose.  Instead, Transatlantic Lines used a barge named the *Guantanamo Bay Express*.  For the voyage at issue, however, Transatlantic Lines had taken the *Guantanamo Bay Express* out of service for maintenance and repairs.

6.      Transatlantic Lines chartered the *Atlantic Trader* from McAlister Towing & Transportation Co.  The *Atlantic Trader* was not in great shape.  Specifically, its deck lacked a full complement of container sockets and D-rings, and those it did have had experienced substantial corrosion.  Other vessels were available that had proper container sockets and other accoutrements, but Transatlantic Lines chose not to charter them.

7.      The voyage at issue departed late.  Rather than leave on the scheduled Thursday, the *Atlantic Trader* departed on Saturday.

8.      It would have taken an additional two days to install proper container sockets on the *Atlantic Trader*.

9.      Prior to the incident, Transatlantic Lines and Portus had a lengthy business relationship.  Portus provides stevedoring services, and would load the *Guantanamo Bay Express* before its voyages to Cuba.

3

10. Transatlantic Lines also hired Portus to load the *Atlantic Trader*. In the days beforehand, there was some discussion of whether Transatlantic Lines would need to do any work to make the *Atlantic Trader* suitable for the voyage. On February 25, 2013, Transatlantic Lines employee Robert Eley sent an email suggesting that container sockets either be added to or burned off of the *Atlantic Trader*'s deck. Eley sent this email to three people: Transatlantic's port coordinator Rob Leigh, Scott MacGregor, and Portus's general manager Brad Bishop.

11. Despite these discussions, no work had been done to the *Atlantic Trader*'s deck by March 1, 2013.

12. On that date, Transatlantic Lines brought the *Atlantic Trader* to Mobro Marine's shipyard. There, Transatlantic Lines hired Mobro to install a crane and weld 30 D-rings to the *Atlantic Trader*'s deck. Transatlantic's port coordinator Rob Leigh served as Transatlantic's representative at this time. Transatlantic Lines purchased the D-rings. Portus general manager Brad Bishop placed the D-rings where Morbo should weld them. Bishop placed the new D-rings wherever old D-rings were missing.

13. After placing the D-rings and directing Mobro to install the crane, Bishop and Leigh left Mobro's shipyard. During the drive back, they discussed how to approach the problem of the *Atlantic Trader*'s missing container sockets. Bishop proposed using wooden 4x4s as dunnage to level the deck and accommodate the shipping containers. Leigh agreed.

14. Portus loaded the *Atlantic Trader* on March 2, 2013. In loading the vessel, Portus used 4x4 wooden dunnage to level the deck to accommodate the shipping container stacks.

4

15. Portus's suggestion to use the wooden dunnage constituted a breach of its duties to Transatlantic Lines, and fell below the applicable standard of care. Its use was neither workmanlike nor reasonably prudent under the circumstances. In reaching this conclusion, the Court credits the opinion of Mobro's expert Christopher Karentz that the use of wooden dunnage in this manner was not acceptable.

16. Further, the Court notes that Portus's own stevedoring expert, Kevin Highfield, stated that the use of wooden dunnage was "marginal." Mr. Highfield opined that Portus did not breach its duties to Transatlantic Lines by using this dunnage primarily because Transatlantic Lines instructed Portus to do so. But this fails to appreciate Portus's role in suggesting the use of wooden dunnage in the first place.

17. Transatlantic Lines shares some fault for the use of the wooden dunnage. It retained ultimate authority over the loading of the vessel and was negligent to accept Portus's recommendation to use it.

18. Additionally, Transatlantic Lines was negligent in tendering the *Atlantic Trader* to Portus for loading in the condition that it was in, and failing to provide Portus with the *Atlantic Trader*'s Trim and Stability Booklet.

C. **Mobro's Welding of the D-rings**

19. As mentioned above, Transatlantic Lines hired Mobro to weld 30 D-rings to the *Atlantic Trader's* deck on March 1, 2013.

20. Neither Portus nor Transatlantic Lines has proved by a preponderance of the evidence that Mobro performed these welds in a negligent manner. In his testimony, Portus's welding expert Frank Grate identified several welds that he believed to be negligently done. However, the Court does not find that either Transatlantic Lines or Portus proved, through credible evidence, that Mobro performed those welds.

21. At trial, Portus attempted to distinguish new welds that Mobro performed from old preexisting welds by arguing that Mobro painted its welds gray. The Court does not credit this assertion. Mobro's welding supervisor, Mark Wooten, testified that Mobro paints its welds black, yellow, or red. Additionally Brad Bishop testified that the old welds were painted gray.

D. **Transatlantic's Operation of the *Atlantic Trader***

22. On March 2, 2013, the *Altantic Trader* left Portus's facility in Jacksonville and began its journey to Guantanamo Bay.

23. From this point on, the vessel was entirely in Transatlantic's control.

24. The tug *Spence* towed the *Atlantic Trader*, and was also in Transatlantic's control.

25. Transatlantic Lines knew that the wooden dunnage Portus used to level the deck would likely compress during the voyage. Transatlantic's port coordinator Robert Leigh testified as much.

26. It was foreseeable that the wood dunnage would compress, that this would cause slack in the lashings, and that the lashings would fail as a result.

27. But Transatlantic Lines made no effort to monitor the dunnage for compression or to tighten the lashings to eliminate the resulting slack. No weather, sea, or other conditions prevented Transatlantic Lines from doing so.

28. Transatlantic's failure to monitor the dunnage and tighten the lashings was negligent and contributed to the loss at issue in this suit.

E. **Damages and Apportionment of Fault**

29. Both Portus and Transatlantic Lines bear some fault in deciding to use wooden dunnage to level the *Atlantic Trader*'s deck. Transatlantic Lines chartered the

6

*Atlantic Trader* and provided it to Portus in poor condition for its scheduled voyage. Portus, through its agent Brad Bishop, proposed an inadequate solution to the problem. Transatlantic Lines, through its agent Rob Leigh, agreed with the proposal. Each of these actions were not reasonable under the circumstances and contributed to the loss.

30.     Transatlantic Lines also bears fault in failing to have its crew monitor the cargo during the voyage, despite the fact that its agent Robert Leigh foresaw that the dunnage might compress creating slack in the lashings. Failing to monitor the cargo was unreasonable under the circumstances.

31.     Accordingly, the Court apportions fault as follows: 60% upon Transatlantic Lines and 40% upon Portus.

32.     Transatlantic Lines has proved $517,942.03 in recoverable damages attributable to the loss. This includes the loss of two shipping containers that Transatlantic owned outright.

33.     Transatlantic Lines has failed to prove by a preponderance of the evidence the following: its claims for $51,287.21 for "excess fuel;" that it reasonably incurred the $1,350 paid to Equipment Solutions; and that it reasonably incurred the $24,842.79 spent paying salaried employees and related travel expenses in response to the incident.

34.     Accordingly, the Court will enter judgment against Portus Stevedoring, LLC, and in favor of Transatlantic Lines, LLC for damages in the amount of $207,176.81.

35.     No circumstances exist that would make an award of prejudgment interest inappropriate.

## II. CONCLUSIONS OF LAW

Plaintiff Transatlantic Lines sues Portus under three theories: (1) Breach of Contract; (2) Breach of an Implied Warranty of Workmanlike Performance; and (3) Negligence.  Portus has brought Mobro into this suit, alleging that Mobro's own negligence contributed to the loss.

### A. Transatlantic Lines has established Portus's liability.

For the purposes of this case, Transatlantic's claims are not meaningfully different from one another. Transatlantic contends that Portus breached both the contract and its warranty of workmanlike performance "by negligently stowing and securing the cargo containers aboard the *Atlantic Trader*" by using 4x4 wooden dunnage to level the deck.  [DE 115 at 6.]   Eleventh Circuit law confirms that Transantlantic's claim for breach of an implied warranty of workmanlike performance simply restates in more specific terms its claim for breach of contract.  See Vierling v. Celebrity Cruises, Inc., 339 F.3d 1309, 1315 (11th Cir. 2003) ("[S]tevedores and other contractors give shipowners an implicit warranty that their services will be performed in a 'workmanlike' manner.")  Further, a stevedore's duty to perform in a workmanlike manner is the same as its duty to exercise reasonable care under negligence law.  See id. (describing the warranty of workmanlike performance as an "implied promise to perform those services with reasonable care, skill, and safety"); see also In re Lady Jane, Inc., 818 F. Supp. 1470, 1476 (M.D. Fla. 1992) (characterizing a claim for breach of a repair contract and negligent repair of a vessel as "based on essentially the same theory").

Accordingly, to prevail on its claims, Transatlantic Lines must show by a preponderance of the evidence that Portus failed to perform its stevedoring duties with

8

reasonable care, and that this failure caused Transatlantic Lines harm.  Transatlantic Lines has made this showing.

"In admiralty the duty of care may be derived from three basic sources: (1) duly enacted laws, regulations, and rules; (2) custom; and (3) the dictates of reasonableness and prudence."  Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-2 (5th ed.).  The Court relies upon the testimony of expert witnesses John Tirel, Kevin Highfield, and Christopher Karentz in concluding that Portus's suggestion that Transatlantic Lines use the wooden dunnage at the heart of this case was neither customary in the shipping industry nor reasonable under the circumstances.

**B.  Transatlantic's own negligence contributed to the loss.**

A finding that Portus is liable on Transatlantic's claims does not end this Court's inquiry, however.  The Court must also consider whether Transatlantic's fault contributed to the loss.  "Disputes between vessels and stevedores over damaged cargo are best accommodated by a straightforward application of the usual maritime comparative fault system."  Gator Marine Serv. Towing, Inc. v. J. Ray McDermott & Co., 651 F.2d 1096, 1100 (5th Cir. 1981); see also Hercules, Inc. v. Stevens Shipping Co., 765 F.2d 1069, 1075 (11th Cir. 1985) ("Unless it can truly be said that one party's negligence did not in any way contribute to the loss, complete apportionment between the negligent parties, based on their respective degrees of fault, is the proper method for calculating and awarding damages in maritime cases.")

In so holding, the Court rejects Transatlantic's contention, made in its Revised Proposed Findings of Fact and Conclusions of Law, that a "stevedore cannot use the vessel operator's failure to discover and correct the stevedores' negligence as a defense."  [DE 115 at 7.]  In support of this argument, Transatlantic Lines relies upon

9

Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124 (1956). Ryan holds that a shipowner is strictly liable for personal injuries resulting from an unseaworthy vessel, and requires a stevedore to completely indemnify the shipowner for any such injury caused by the stevedore's negligence. Id. at 132–35.

But Ryan espouses a "withered" doctrine. See Schoenbaum, Admiralty & Mar. L. § 5-9. In cases of property damage, "the doctrine of strict liability for unseaworthiness does not apply" and "courts consistently conclude that implied Ryan indemnity does not apply" either. Id. "Since property damage cases involve questions of liability for negligence, not unseaworthiness, damages should be divided in proportion to fault." Id.; see also Meridian Bulk Carriers, Ltd. v. Kinder Morgan Bulk Terminals, Inc., 8:07-cv-1422-T-33TGW, 2009 WL 2180582, at *8 (M.D. Fla. July 22, 2009) (concluding that "[i]n property damage cases, the Ryan doctrine has been virtually abandoned").

As with Portus, Transatlantic Lines must conduct itself with reasonable care and exercise reasonable prudence under the circumstances. Schoenbaum, Admiralty & Mar. L. § 5-2. Relying on the expert opinions of John Tirel, Kevin Highfield, and Christopher Karentz, the Court concludes that Transatlantic Lines failed to exercise reasonable care when it approved Portus's suggestion to use the wooden dunnage, when it tendered the *Atlantic Trader* to Portus in the condition that it was in, when it failed to provide Portus with the *Atlantic Trader*'s Trim and Stability Booklet, and when it failed to monitor the vessel's cargo for compression of the dunnage and to tighten the lashings if necessary.

The allocation of fault need not be carried out with mathematical precision. Flowers Transp., Inc. v. M/V Peanut Hollinger, 664 F.2d 112, 114 (5th Cir. Dec. 18,

1981).  A rough estimate is acceptable.  Id.  Accordingly, the Court assigns fault as follows: 40% to Portus Stevedoring, LLC, and 60% to Transatlantic Lines, LLC.

### C. Mobro is not liable for the loss.

The Court concludes that Mobro is not liable for any of the loss.  Defendant Portus brought Mobro into the suit under Federal Rule of Civil Procedure 14(c).  Rule 14(c) reads in relevant part—

> If a plaintiff asserts an admiralty or maritime claim under Rule 9(h), the defendant or a person who asserts a right under Supplemental Rule C(6)(a)(i) may, as a third-party plaintiff, bring in a third-party defendant who may be wholly or partly liable—either to the plaintiff or to the third-party plaintiff—for remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. . . . The third-party plaintiff may demand judgment in the plaintiff's favor against the third-party defendant.  In that event, the third party defendant must defend under Rule 12 against the plaintiff's claim as well as the third-party plaintiff's claim; and the action proceeds as if the plaintiff had sued both the third-party defendant and the third-party plaintiff.

Although Portus styles its claim as one for contribution, Portus actually alleges that Mobro is directly liable to Transatlantic Lines for Mobro's own negligence.  Specifically, Portus alleges that Mobro negligently welded D-rings to the *Atlantic Trader*'s deck and that this caused at least part of the loss at issue in this case.  If true, the Court should apportion to Mobro some liability under its comparative fault inquiry.

"[I]n an admiralty suit, once a defendant impleads a third party in an effort to shift the burden of liability in whole or in part from its own shoulders, and demands judgment in favor of the original plaintiff against that third party, the suit proceeds as if the original plaintiff had sued the third party."  Rodi Yachts, Inc. v. National Marine, Inc., 984 F.2d

880, 882 (7th Cir. 1993). Accordingly, Portus and Transatlantic Lines bear the burden of proving Mobro's negligence.

They have not done so. The Court will therefore enter judgment in Mobro's favor and assign it no liability.

### D. Recoverable Damages

As with any tort, the plaintiff bears the burden of proving its actual damages. See Mayor, Aldermen and Commonality of City of New York v. Ransom, 64 U.S. 487, 488 (1859). "The plaintiff bears the burden of proof to show the amount, as well as the fact, of damages." Pizani v. M/V Cotton Blossom, 669 F.2d 1084, 1088 (5th Cir. 1982).

Here, Transatlantic Lines alleges that it suffered a loss of $591,442.03 as a result of the incident. [DE 115 at 10.] Transatlantic itemizes its alleged losses in its Exhibits 10 and 18. However, after reviewing the testimony and other evidence submitted at trial, the Court concludes that Plaintiff has not proved all these alleged damages. Specifically, Transatlantic Lines has not shown that Portus's negligence caused Transatlantic to incur the travel expenses, salary, and bonuses it paid to its own employees after the accident. Additionally, Transatlantic Lines did not prove its entitlement to recover the excess fuel costs it claims, or the payment made to Equipment Solutions. Accordingly, the Court determines that Plaintiff has proved losses of only $517,942.03 resulting from the accident. Since the Court has also determined Transatlantic Lines to be 60% at fault for the accident, the Court will enter judgment in Transatlantic's favor for $207,176.81.

In reaching this conclusion, the Court rejects an argument raised in Mobro's proposed findings of fact and conclusions of law that Transatlantic Lines may recover nothing for its loss. Specifically, Mobro relies on Robins Dry Dock Co. v. Flynt, 275 U.S.

303 (1927), for the proposition that "persons who do not have a proprietary interest in property have no cause of action for their economic losses." [DE 117 at 23.]

The Court does not believe that Robinson precludes recovery in this case. Importantly, Transatlantic Lines did have a propriety interest in the lost property. It had a bareboat (or demise) charter of the *Atlantic Trader*. Cf. Robinson, 275 U.S. at 308 ("[I]t is not argued that there was a demise, and the owners remained in possession.") As Morbo concedes, Transatlantic Lines owned some of the lost shipping containers outright. [DE 117 at 25.] And it leased the rest. Transatlantic Lines may therefore recover for its lost property and "attendant economic damages." See Consol. Aluminum Corp. v. C.F. Bean Corp., 772 F.2d 1217, 1222 (5th Cir. 1985).

The Court likewise does not credit Mobro's citation to BP North Am. Petroleum, Inc. v. Robert E. Lee, 993 F.2d 1193 (5th Cir. 1993), for the proposition that a lease does not satisfy Robinson's proprietary-interest requirement. In Robert E. Lee, BP North American Petroleum sued a vessel that crashed into a docking facility. 993 F.2d at 1193–94. BP North American had "preferential docking rights at the damaged berth" and an exclusive right to use certain pipelines nearby. Id. at 1194. The *Robert E. Lee*'s negligence had interfered with BP North American's enjoyment of these rights and caused it economic harm. Id.

The Fifth Circuit held this was not enough to satisfy Robinson. But in doing so, the Fifth Circuit observed that "the requirements for proprietary interest are actual possession or control, responsibility for repair and responsibility for maintenance." Robert E. Lee, 993 F. 2d at 1194. Although "BP [North American] fail[ed] to meet any of the criteria," Transatlantic Lines meets all of them.

13

A review of the Eleventh Circuit's application of Robinson reinforces this Court's conclusion.  The Eleventh Circuit has applied Robinson to preclude recovery by shippers delayed when a vessel sunk Tampa Bay's Sunshine Skyway Bridge, preventing access to and from the Port of Tampa, see Hercules Carriers, Inc. v. Florida, 720 F.2d 1201, 1202 (11th Cir. 1983), and when two ships collided to similar effect, Kingston Shipping Co. v. Roberts, 667 F.2d 34, 35 (11th Cir. 1982); United States v. I.S. Joseph Shipping, Ltd., 720 F.2d 1206, 1206 (11th Cir. 1982).  That is, the Eleventh Circuit has applied Robinson to cut off a defendant's liability to strangers to an accident.  The Eleventh Circuit has not applied Robinson to limit liability in the circumstances that this case presents.

### E.  Prejudgment Interest

"As a general rule, pre-judgment interest should be awarded in admiralty cases." St. Paul Fire and Marine Inc. Co. v. Lago Canyon, Inc., 561 F.3d 1181, 1191–92 (11th Cir. 2009).  "Pre-judgment interest is not a penalty, but compensation to the plaintiff for the use of funds that were rightfully his."  Id.  "A district court has discretion to deny prejudgment interest when there are peculiar circumstances that make it inequitable for the losing party to pay prejudgment interest."  Id. (internal quotation marks omitted).

Here, there are no "peculiar circumstances" that would render an award of prejudgment interest inappropriate.  The Court will therefore make such an award, and at an annual interest rate of 3.25%.

### III.  CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that a separate Final Judgment will be entered in favor of Plaintiff Transatlantic Lines LLC and Third-

Party Defendant Mobro Marine, Inc., and against Defendant Portus Stevedoring LLC, consistent with the Court's Findings of Fact and Conclusions of Law.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida on this 6th day of October, 2015.

/s/ James I. Cohn
JAMES I. COHN
United States District Judge

Copies furnished to counsel of record via CM/ECF.